IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA,
WESTERN DIVISION

IN RE:

EDWARD LEE POTTER,                              BK 03-82842-JAC-7

     DEBTOR.

EDWARD LEE POTTER,                              AP 05-70053-CMS

     PLAINTIFF,

vs.

CITY OF HANCEVILLE, et al.,

     DEFENDANTS.

## MEMORANDUM OF DECISION

This matter came before the court on the defendants' motions for summary judgment in their favor on former Hanceville Police Chief Edward Lee Potter's complaint accusing them of illegally discriminating against him because of his bankruptcy. The court has reviewed the record of the hearing and the submissions of the parties in the context of applicable law. It finds the defendants motions, filed under Fed. R. Civ. P. 56, are due to be **DENIED;** and the plaintiff's objections to summary judgments, **SUSTAINED**.

## FINDING OF FACTS

The plaintiff Edward Lee Potter was the police chief of Hanceville, Alabama, from September 12, 2002 until October 4, 2004, when a newly elected City Council appointed another candidate as chief of police. The City of Hanceville and five of the members of its council are

1

defendants in this action.  Defendants include the City of Hanceville, Alabama; Mayor Katie Whitley; and Council Members Wayne Armstrong, Hubert Jones, Selma Barnett, and Larry Cornett.

The complaint was filed February 4, 2005 in the United States District Court for the Northern District of Alabama. District Judge Lynwood Smith referred the action to the Bankruptcy Court for the Northern District pursuant to 28 U.S.C. § 157(a) on October 26, 2005. The action then became Adversary Proceeding No. 05-70053.

The individual defendants and the defendant City of Hanceville, each filed a motion for summary judgment and briefs in support their motions.  Included within each brief is a statement of facts.  The plaintiff Potter also filed a brief in response and in opposition to these motions for summary judgment, which agreed with many of the facts stated in defendants' briefs.  For convenience, the court will refer to plaintiff's response (AP Doc. 136) to identify those agreed-upon facts.

Potter was appointed chief of police on September 12, 2002 by a prior council.  Pursuant to Ala. Code §  11-43-4 , his service was to continue until a successor was appointed by the City Council and qualified. In July of 2003, while serving as chief, Potter filed a Chapter 7 bankruptcy petition. (AP Docs. 94-99, Potter deposition at p.138).  The plaintiff's bankruptcy filing became the subject of conversation in the rumor mill in the City of Hanceville. (Doc. 136 at p. 6)  Potter's Chapter 7 discharge was entered on October 23, 2003.

Hanceville had a population of approximately 2,951 residents as of  the 2000 census. All seats on its City Council and the mayor's office were up for election in the 2004 campaign. The parties have described a form of municipal government in which the mayor sits on the council and has an equal vote with other council members. Those elected in the city election took  office October

2

4, 2004. (Doc. 136 at page 3-4).

Ala. Code § 11-43-4 (1975), as amended, provides as follows:

**§ 11-43-4.   Election of clerk, etc., in towns and in cities having less than 6,000 inhabitants; filling of vacancies in council generally.**

In cities having a population of less than 6,000 and in towns, the council shall elect a clerk and fix the salary and term of office, and may determine by ordinance the other officers of the city or town, their salary, the manner of their election and the terms of office, and shall fill all vacancies in the council by a majority vote of the council; and all members of the council may vote to fill vacancies any provision of law to the contrary notwithstanding.  The clerk and such other officers elected by the council shall serve until their successor or successors are elected and qualified. (emphasis added)

The parties have not provided the court with a copy of an ordinance establishing the office of chief of police, but have stipulated that "in the City of Hanceville (as well as most, if not all, cities of similar population in Alabama) the position of Chief of Police, as well as City Attorney, City Clerk and Municipal Judge, serves at the pleasure of, is appointed by, and whose term of appointment coincides with the elected term of the Mayor and City Council" (Doc. 136 at p. 3).

Mayor-elect Katie Whitley heard the rumor about Potter's bankruptcy and went to the United States Bankruptcy Court in Decatur to obtain copies of part of the plaintiff's bankruptcy petition (AP Doc. 89-92,  Whitley deposition p. 29-32).  This was approximately September 1, 2004. (Plaintiff's Exhibit 10 to AP Doc. 137) Whitley showed these copies to Barnett (Whitley deposition at p. 37), and Cornett (Whitley deposition at p. 46),  giving copies to Cornett.

To one extent or another, the fact that the plaintiff had filed bankruptcy was a subject of conversation among all those who were elected  to the City Council. Prior to being sworn in as mayor and city council members, the soon-to- be city officials began looking for someone other than Potter to appoint as chief of police. The City of Hanceville and the newly elected mayor and council

3

did not advertise the chief of police position as an opening. Instead, they conducted the search for potential candidates as described below:

Whitley, Jones, and Barnett met with Craig Richie at the Dairy Queen in Hartselle, Alabama around September 10, 2004. (Richie deposition at p. 11). At a second meeting at the Dairy Queen, Richie also met with Whitley and Cornett. (Richie deposition at p. 13)

Wayne Armstrong and Jones also talked with Jimmy Rogers about the possibility of Rogers becoming police chief. Rogers declined. (Armstrong deposition at pp. 25-26) Armstrong talked with Steve Conner about the job and Conner stated that he was not interested in the police chief position. (Armstrong deposition pp. 27-28)

On October 4, 2004, the individual defendants and Councilwoman Betty Walls (who is not named as a defendant in Potter's suit) were sworn in as the new mayor and City Council of Hanceville. AP Doc. 130 is the minutes of the City of Hanceville organizational meeting of October 4, 2004. These minutes reflect the following:

> The mayor recommended Craig Richie as Chief of Police. Alderman Jones moved to elect Craig Richie as Chief of Police. Seconded by Alderman Armstrong. Ayes: Alderman Cornett, Jones, Armstrong, Alderwoman Barnett and Mayor Whitley. Nays: Alderwoman Walls: Motion carried.

Craig Richie thereby became chief of police, and his appointment ended Potter's term as chief. Although Councilman Armstrong seconded the motion to hire Richie as chief of police, his deposition at p. 30 stated that he had never met him before Richie's appointment. The newly elected mayor and city council also voted to appoint a new city clerk and a new municipal judge. (Walls deposition at pp. 50-51)

Potter has alleged in his complaint that the Hanceville defendants denied him continued

4

employment based only on the fact that he had filed bankruptcy; and that the alleged violation of 11 U.S.C. § 525(a) entitled him to damages pursuant to the discrimination cause of action created by 42 U.S.C. § 1983, and to attorneys fees under 42 U.S.C. § 1988.

The defendants, in their motions for summary judgment, argue (1) that their action did not constitute a Section 525(a) violation; (2) that, even if it did, a Section 525(a) violation cannot serve as a predicate for a Section 1983 suit; and (3) that, even if a Section 525(a) violation made Potter eligible for Section 1983 damages, "qualified immunity" shielded named council members from suit as individuals.

This court heard the arguments for and against summary judgment on these three grounds at a July 27, 2006 hearing. The court took the motions under submission following that hearing. The record includes seven depositions, and 14 exhibits in support of, and in opposition to, the six motions for summary judgment.

The following portion of the memoranda will constitute a more detailed analysis of the factual record, as well as the court's conclusions of law. Orders, consistent with these findings pursuant to Fed. R. Bankr. P. 7052, will be entered separately.

## CONCLUSIONS OF LAW

The Bankruptcy Court for the Northern Division of the Northern District of Alabama has jurisdiction over Edward Lee Potter's Chapter 7 case pursuant to 28 U.S.C. § 1334(a). This Bankruptcy Court for the Western Division of the Northern District has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. § 1334(b). Jurisdiction is referred to the bankruptcy courts by the General Order of Reference of the United States District Courts for the Northern District of Alabama, Signed July 16, 1984, As Amended July 17, 1984.

5

Summary judgment is proper only if the record shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c) and Fed. R. Bankr. P. 7056. A genuine issue exists only when "the evidence is such that a reasonable jury (trier of fact) could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, (1986); and Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

The court must view all the evidence in the light most favorable to the non-moving party and draw all inferences in the nonmovant's favor. In making its determination, the court's sole function is to determine whether there is any dispute of fact that requires resolution at trial. The merits of the factual dispute itself are to be addressed by the fact-finder at trial.  See Anderson, 477 U.S. at 249. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." Anderson, 477 U.S. at 255.

In this case, the Bankruptcy Court must weigh the Hanceville defendants' motions for summary judgment under these longstanding rules. It must view the evidence, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," ( see Rule 56(c)) in the record in the light most favorable to Edward Lee Potter.


## I.

### Disputed and inconclusive facts prevent summary judgment for the defendants as to the 11 U.S.C. § 525(a) claim.

**A.  To win a Section 525(a) discrimination action, plaintiff must prove that the bankruptcy filing was the "sole" reason  for a negative employment decision.**

11 U.S.C. § 525(a) provides that a governmental unit may not "deny employment to, terminate

6

the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title ... <u>solely because</u> such bankrupt or debtor ... has not paid a debt that is dischargeable in the case under this title ...”(emphasis added). [1]

It is undisputed that defendant City of Hanceville is a governmental unit in the meaning of Section 525(a), acting through its agent, the City Council; and that the other defendants are voting members of the City Council (including Mayor Whitley). It is undisputed that in 2003, Potter, while serving as Hanceville Police Chief under a previous City Council, filed a Chapter 7 bankruptcy case in the Bankruptcy Court for the Northern District of Alabama, Northern Division, at Decatur, Alabama. He received his Chapter 7 discharge that same year. It is also undisputed that Potter's term as chief of police ended when the newly elected City Council selected Craig Richie as successor chief of police.

Potter alleged in his complaint that his right not to be discriminated against based on a past bankruptcy was violated by the acts of the defendants. Defendants, however, asserted that they

---

[1] The full text of **11 U.S.C. 525(a)** provides the following:

Except as provided in the Perishable Agricultural Commodities Act, 1930, the Packers and Stockyards Act, 1921, and section 1 of the Act entitled "An Act making appropriations for the Department of Agriculture for the fiscal year ending June 30, 1944, and for other purposes," approved July 12, 1943, a governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act (the Bankruptcy Act of 1898, replaced by the Bankruptcy Code of 1978), or another person with whom such bankrupt or debtor has been associated, solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act. (emphasis added)

Case 05-70053-CMS    Doc 139    Filed 11/06/06    Entered 11/06/06 16:30:37    Desc Main
Document    Page 7 of 32

merely filled, by appointment, a position which was vacant by virtue of Ala. Code § 11-43-4.

However, Section 11-43-4 provides only "the clerk and such other officers elected by the council shall serve until their successor or successors are elected and qualified." The statute defines when the terms of appointive city officers will end, but it does not, in itself, vacant their appointments by operation of state law. The language does not mandate every new council to "elect" successors for existing city personnel every election cycle.

The council's election of a new police chief effectively ended the term of the plaintiff's service as police chief. While the action appears to conform to Ala. Code § 11-43-4, that does not mean it might not also have violated 11 U.S.C. § 525(a). Such action could be interpreted to have terminated the employment of, or discriminated with respect to, the employment of the plaintiff, solely because he had been a debtor in a bankruptcy case.

When the inconclusive record facts are considered in the light most favorable to the plaintiff, it is conceivable that a jury could determine that the defendants undertook to replace the plaintiff as chief of police solely because he had filed bankruptcy. Such a finding would show that he was denied employment, terminated or discriminated against with respect to his employment as a result of having been a debtor. On the other hand, a jury might take a different view. It is impossible to determine the issues as a matter of law based on the facts in this record.

The Section 525(a) question turns on whether the city, as a municipal corporation, acting through its agent, the council; and members of the council, chose another candidate as police chief "solely because" of Potter's 2003 bankruptcy filing. This record does not determine that issue.

In the years since the bankruptcy anti-discrimination statute took effect, the majority of courts have applied a strict, plain-meaning construction to the phrase "solely because" of bankruptcy. In

8

<u>Federal Communications Commission v. NextWave Personal Communications, Inc.</u>, 537 U.S. 293

(2003), the Supreme Court considered whether the Federal Communications Commission's (FCC's)

cancellation of a Chapter 11 debtor's broadband personal communications service licenses violated

Section 525(a). Justice Scalia, writing for the majority, found that it did. The FCC had contended the

bankruptcy was not the only cause for its revocation, citing the debtor's payment default and other

"regulatory motives" as additional causes.

> The Supreme Court stated:

> The FCC has not denied that the proximate cause for its cancellation of the licenses was NextWave's failure to make the payments that were due. It contends, however, that § 525 does not apply because the FCC had a "valid regulatory motive" for the cancellation. ... In our view, that factor is irrelevant. When the statute refers to failure to pay a debt as the sole cause of cancellation ("solely because"), it cannot reasonably be understood to include, among other causes whose presence can preclude application of the prohibition, the governmental unit's <u>motive</u> in effecting the cancellation. Such a reading would deprive § 525 of all force. It is hard to imagine a situation in which a governmental unit would not have some further motive behind the cancellation-assuring the financial solvency of the licensed entity, <u>e.g.</u>, <u>Perez v. Campbell</u>, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233(1971); <u>In re The Bible Speaks</u>, 69 B.R. 368, 374 (Bkrtcy.D.Mass. 1987), or punishing lawlessness, <u>e.g.</u>, <u>In re Adams</u>, 106 B.R. 811, 827 (Bkrtcy.D.N.J. 1989); <u>In re Colon</u>, 102 B.R. 421, 428 (Bkrtcy.E.D. Pa. 1989), or even (quite simply) making itself financially whole. Section 525 means nothing more or less than that the failure to pay a dischargeable debt must alone be the proximate cause of the cancellation – the act or event that triggers the agency's decision to cancel, whatever the agency's ultimate motive in pulling the trigger may be.

<u>NextWave Communications</u>, 537 U.S. at 301-02.

> Section 525(a) was included in the Bankruptcy Code of 1978 following the Supreme Court's

1971 decision in <u>Perez v. Campbell</u>, 402 U.S. 637, declaring an Arizona motor vehicle law

unconstitutional under the supremacy clause of the U.S. Constitution. The Arizona law suspended

debtors' drivers' licenses for their failure to pay judgments which had been discharged in bankruptcy.

<u>See also</u> <u>Exquisito Services, Inc. v. United States</u> (<u>In re Exquisito Services, Inc.</u>), 823 F.2d 151, 153-

154 (5th Cir. 1987);  Laracuente v. Chase Manhattan Bank, 891 F.2d 17, 21-22 (1st Cir. 1989); Toth
v. Michigan State Housing Development Authority, 136 F.3d 477, 480 (6th Cir. 1998), cert. denied
524 U.S. 954 (1998) (applying "plain language" interpretation of Section 525(a) as to prohibited
transactions); Smith v. St. Louis Housing Authority (In re Smith), 259 B.R. 901, 906 (8th Cir. BAP
2001); Taylor v. U.S. (In re Taylor), 263 B.R. 139, 147 (N.D. Ala. 2001) (plain-language reading of
Section 525(c)(1)); and Pastore v. Medford Savings Bank, 186 B.R. 553, 555 (D. Mass. 1995)
(differentiating between the broader "plain language" prohibitions in Section 525(a), and the narrower
limitations on private employers in Section 525(b)).

Potter, the non-moving party, has so far offered evidence and arguments suggesting, but not
proving,  that his bankruptcy filing alone accounted for the City Council's failure to appoint him
police chief. The Hanceville defendants, the moving parties,  have offered evidence and arguments
suggesting, but not proving, other motives. No witnesses have testified in open court, subject to
formal cross-examination, on these alleged facts.

Proving the strictly construed proximate cause requirement can present problems for both
offense and defense in Section 525 suits. In B.F. Goodrich Employees Federal Credit Union v.
Patterson (In re Patterson), 967 F.2d 505 (11th Cir. 1992), the Eleventh Circuit Court of Appeals held
that a credit union manager's own testimony conclusively proved that the debtors' bankruptcy was
the "sole" cause of the credit union's freeze of their checking account. The facts in Patterson, which
originated in this Bankruptcy Court, were somewhat unusual. The debtor was not in default to the
credit union when he filed bankruptcy because he paid by payroll deduction, a deduction that
continued for some months postpetition. The Patterson claim was filed under 11 U.S.C. § 525(b)
which was added to the statute by the 1984 bankruptcy amendments. The amendment extended the

10

bankruptcy discrimination prohibition to private employers and their affiliates, as well as governmental entities. As with Section 525(a), 525(b) also limited the prohibition to discrimination "solely because" of bankruptcy.

The Eleventh Circuit stated:

> The Credit Union discriminated against the Pattersons solely on the basis of their bankruptcy filing. The discriminatory act was suspending the Pattersons' membership privileges. The Credit Union maintains a policy that any member who causes the credit union a loss shall be denied services. Mr. Phillips (the credit union manager) testified, however, that the Pattersons had not caused the credit union a loss at the time the Credit Union decided to suspend services to the Pattersons. Instead, the Credit Union made that decision upon being informed that the Pattersons had filed for bankruptcy. On this basis, the bankruptcy court found, and we agree, that the Credit Union applied its policy in a manner that discriminates against those who file for bankruptcy. Nothing in this holding abrogates the general proposition that a creditor should not be forced to do business with a debtor. See Brown v. Pennsylvania State Employees Credit Union, 851 F.2d 81, 81 (3rd Cir. 1988). The Credit Union's policy in furtherance of this proposition is enforceable, however, only when applied without regard to a member's bankruptcy filing.

Patterson, 967 F.2d at 514.

The facts are not so clear cut in most Section 525 cases, particularly at the summary judgment stage. See also Everett v. Lake Martin Area United Way, et al., 46 F.Supp.2d 1233 (M.D. Ala. 1999) (plaintiff lost on summary judgment because she failed to make prima facie case that bankruptcy was the only reason for her termination).

In the more usual Section 525(a) action, it is unlikely that the defendants would admit that the only reason for their action was that a plaintiff had filed bankruptcy. The trier of fact "must look to the objective evidence presented and draw reasonable inferences from that evidence as to the subjective intent of the parties involved." See McKibben v. Titus County Appraisal District, et al., 233 B.R. 378, 381 (E.D. Tex. 1999).

11

While Section 525(a) makes hiring discrimination solely because of bankruptcy a violation of federal law, the statute itself provides no specific remedy for the violation or procedure for private lawsuits. Consequently, some courts have fashioned remedies based on the general equitable powers granted bankruptcy courts under 11 U.S.C. § 105(a). [2] See Exquisito, 823 F.2d at 155. Others have considered Section 525(a) violation in the Section 1983 context.

**B. Application of the Section 525 elements to each of the defendants' motions for summary judgment.**

The court has reviewed the seven depositions and 14 exhibits filed in support of, and in opposition to, the motions for summary judgment. The summary of facts as they relate to each defendant below, is not, and does not attempt to be, a complete recitation of facts in the record. Under the admonition and guidance of the United States Supreme Court as noted above, the court views these facts in the light most favorable to the nonmoving party, the plaintiff in this action.

**1. Councilman Wayne Armstrong:**

Councilman Wayne Armstrong's motion for summary judgment is found at AP Doc. 60; and AP Doc. 71, as amended by AP Doc. 85, is the brief in support of the motion filed on Armstrong's behalf. Potter's response in opposition to summary judgment is found at AP Doc. 136.

AP Docs. 101 and 102 comprise a copy of Armstrong's deposition. Armstrong testified that he had heard the rumor that the plaintiff had filed bankruptcy and had discussed the fact with fellow

---

[2] **11 U.S.C. 105(a)** provides the following:

The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

12

councilman Hubert Jones, but that bankruptcy was no big deal to him. (Armstrong deposition, at pp. 21, and 35)  Exhibit 5 to AP Doc. 137 is a copy of Armstrong's response to the plaintiff's request for admissions.   In answer to Question 1, he stated that he did not know that the plaintiff had filed bankruptcy prior to October 4, 2004, the date he took office as city councilman.   In response to Question 4, he denied that he had discussed plaintiff's bankruptcy with any other defendants in this action prior to October 4, 2004.   He testified that when he was campaigning prior to the election people wanted a clean sweep of City Hall (Armstrong deposition at pp. 22-23).   Although he stated that probably 90% of the people he talked to wanted a change, he said could not remember the names of anyone who stated this. (Armstrong deposition at p. 24)

Plaintiff's Exhibit 7,  included in AP Doc. 137,  is the affidavit of Steven Conner, a former police officer with the City of Hanceville.   In paragraph 3, Conner's affidavit states:

> On two occasions prior to Chief Potter being replaced, I was approached by councilman, Wayne Armstrong, offering me the Chief of Police job.  I turned him down on both occasions. On the first occasion in which he offered me the job, I asked Mr. Armstrong why he was letting Chief Potter go, because I believed Chief Potter was doing a good job.  He replied, he filed bankruptcy.  I said, that is not a crime, to which Mr. Armstrong did not respond.  Wayne Armstrong never offered any other reason for replacing Potter.

However, during Armstrong's deposition, when asked if he mentioned to Steve Conner that Potter had filed bankruptcy, his answer was "no sir". (Armstrong deposition at p. 29)

In the court's view, reasonable jurors, weighing the evidence and judging credibility, could accept the testimony of Steve Conner and reject Armstrong's testimony.   Assuming they believed Conner's testimony, a reasonable jury could find that Armstrong opposed Potter's appointment "solely because" he had filed bankruptcy.

**2. Councilwoman Selma Barnett:**

13

AP Doc. 61 is Councilwoman Selma Barnett's motion for summary judgment; and AP Doc. 72, as amended by AP Doc. 83, is the brief in support of Barnett's motion for summary judgment. AP Doc. 136 is the plaintiff's response in opposition to summary judgment.

AP Docs. 103-105 comprise Barnett's deposition. Barnett testified in deposition that she had not decided whether or not she would support the plaintiff's reappointment until October 3, 2004, the day before the council meeting. She testified that she made up her mind as a result of an incident involving the plaintiff's wife at a local restaurant (Barnett deposition at pp. 44-46). She further stated that one of the campaign issues was replacement of the chief and city clerk. (Barnett deposition at p. 62). It was her testimony that the Potter's bankruptcy filing was not a problem with her since her daughter had also filed bankruptcy. (Barnett deposition at p. 36, pp. 66-67). She further testified that when she met with Craig Richie, who was subsequently hired as chief, along with Jones, Katie Whitley, and Whitley's husband, the subject of plaintiff's bankruptcy did not come up during the conversation. (Barnett deposition at p. 48).

However, Exhibit 6 to plaintiff's evidence submitted in opposition to motion for summary judgment (AP Doc. 137) is the affidavit of Betty Dover, Potter's sister-in-law. In part, Dover's affidavit stated:

> On September 29, 2004. I called Selma Barnett and asked her if she was supporting Chief Potter? She said, no. I asked her why, is it because he had a bankruptcy? She said, yes. I said, "Selma, have you never known anyone to bankrupt?" She said, yes, her daughter, due to health bills. I asked her if she knew why Chief Potter had bankrupted and she said, no. I said, "Selma, you know Chief Potter is good for the city and community." She said, it was a done deal and it wasn't going to be changed, a man named Richie had the job.

That date was prior to October 3, 2004, when Barnett testified in deposition that she made up her mind not to support the plaintiff's reappointment. Additionally, both Jones and Armstrong stated in

14

their depositions that they had talked with Barnett prior to their meeting with the plaintiff on September 29, 2004; and that she had indicated that she was not going to support his reappointment . (Jones deposition at pp. 78-80, Armstrong deposition at pp. 45-48)

Craig Richie in his deposition (AP Docs. 131-133) also described a meeting where Barnett was present and plaintiff's bankruptcy was discussed. He stated:

> Selma Barnett had spoken with me in the presence of Mayor Whitley a few times. Selma wasn't in agreeance [sic] with Mayor Whitley's statements on that because I believe through the line one of Selma's family members may have filed bankruptcy. Whenever Katie Whitley would bring it up, Selma would get a little bit perturbed at her over it. So it wasn't brought up after that again.

(Richie deposition at p.50)

In summary, Barnett testified that the plaintiff's bankruptcy did not bother her, and that it was not discussed in the meeting she had with the person who was ultimately appointed as police chief. Dover's affidavit contradicts this assertion by stating Barnett said "yes" when asked if her failure to support Potter was due to his bankruptcy. Richie, in his deposition, also contradicted Barnett's statement that plaintiff's bankruptcy was not discussed during the conversation. The Dover affidavit, and deposition testimony from Armstrong and Jones contradict Barnett's testimony that she had not decided whether or not to support the plaintiff's reappointment until October 3, 2004.

Again, it is for the trier of fact to decide which witnesses are most credible and to draw the appropriate factual inferences.

**3. Councilman Larry Cornett:**

AP Doc. 62 is Councilman Larry Cornett's motion for summary judgment, and AP Doc. 73, as amended by AP Doc. 82, is the brief in support of Cornett's motion for summary judgment. AP Doc. 136 is the plaintiff's response in opposition to summary judgment. AP Docs.116-117 comprise

15

the deposition of Larry Cornett.

In deposition, Cornett stated that he was aware that Potter had filed bankruptcy, and that Mayor Whitley had given him a copy of the bankruptcy petition. (Cornett deposition at pp. 21-22) He stated that he never told anyone that he was not supporting the plaintiff's reappointment because he had filed bankruptcy. (Cornett deposition at pp. 30, 40, 44, 49) Cornett testified that he only discussed the Potter bankruptcy with Mayor Whitley, Selma Barnett, and his wife. (Cornett deposition at p. 30) He also stated that there were reasons other than bankruptcy for not reappointing Potter, including the fact that the plaintiff was supporting a mayoral candidate Armstrong did not like; and his belief that some of the police officers were not qualified. (Cornett deposition at pp. 31-33)

Dover's affidavit (Exhibit 6 to AP Doc.137) described a conversation with Cornett in which she stated that he said he could not support the Potter "because he had bankrupt". She stated that he further stated that "No, I can't stand the fact he bankrupt and he had all those credit cards."

Exhibit 9 to AP Doc.137 is a statement signed by Joann Walls, the council member who voted against Richie and who is not named as a defendant in this lawsuit. Walls' statement described a conversation with Cornett in which "he said he couldn't hire Chief Potter because Potter had declared bankruptcy... Mr. Cornett said in his opinion he couldn't vote on Chief Potter because of the bankruptcy but gave no other reason."

In Walls' deposition (AP Docs. 107-111), she also described a conversation she had with Cornett. She stated, "he said very sternly that he couldn't support him because he had been in bankruptcy. And that is exactly how he expressed it." She further stated that he did not give any other reason. (Walls deposition at p. 39). Cornett testified in his deposition that a person who owed him money had filed bankruptcy in the past and that he had not received his money. (Cornett

Case 05-70053-CMS    Doc 139    Filed 11/06/06    Entered 11/06/06 16:30:37    Desc Main
Document    Page 16 of 32

deposition at pp.26-29)

The conflicting testimony in the record so far must be judged at trial before a fact-finder.

**5. <u>Councilman Hubert Jones</u>:**

AP Doc. 63 is Councilman Hubert Jones' motion for summary judgment; and AP Doc. 74, as amended by AP Doc. 81, is his brief in support of summary judgment. AP Doc. 136 is the plaintiff's response in opposition to summary judgment. AP Docs. 112-114 comprise the deposition of Hubert Jones.

Jones, in his deposition, stated that he had heard the rumors that Potter had filed bankruptcy, but that he ignored them because he had already made up his mind to replace the plaintiff, if elected. (Jones deposition at pp. 25-26) He stated it was his opinion that the police department was not operating efficiently, describing problems he felt existed in the department. (Jones deposition at pp. 26-35).

Exhibit 2 to AP Doc.137 is a copy of Jones' response to plaintiff's request for admissions. In answer to question 1, he denied that he knew the plaintiff had filed bankruptcy prior to October 4, 2004, the date he took office as a newly elected city councilman. Under question 4, he denied that he had discussed the fact that the plaintiff had filed bankruptcy prior to the council's meeting to appoint a new police chief. On page 45 of his deposition, Jones again stated that he had not discussed plaintiff's bankruptcy prior to the council's vote. Jones further stated that he had never talked to Katie Whitley about the fact that Potter had filed bankruptcy. (Jones deposition at p. 45)

However, Armstrong's deposition (AP Docs. 101-102), Armstrong stated that he and Jones may have talked about plaintiff's bankruptcy "a little bit, but not a whole lot." (Armstrong deposition at pp. 21-22) In Richie's deposition (AP Docs. 131-133), Richie described a

conversation in a meeting including Mayor Whitley and Jones. Richie stated that the mayor was not happy with the chief of police's bankruptcy filing;  and that Jones agreed with her, and did not feel it was in the best interest of the city. (Richie deposition at p. 51)

There is a fact dispute on the face of this record which cannot be resolved on summary judgment.

**6. Mayor Katie Whitley:**

AP Doc. 64 is Mayor Katie Whitley's  motion for summary judgment, and  AP Doc. 75, as amended by AP Doc. 84, is Whitley's  brief in support of summary judgment.  AP Doc. 136 is the plaintiff's response.

Whitley's deposition is AP Docs. 89-92.  Whitley testified that she went to the bankruptcy court in Decatur and obtained copies of part of the plaintiff's bankruptcy petition after she heard that he had filed bankruptcy.  She stated that she did not vote to retain the plaintiff as police chief because he was not doing a satisfactory job. (Whitley deposition at pp. 100-113)

However, Richie, in his deposition (AP Docs. 131-133), described multiple conversations with Mayor Whitley in which he recalled  "just her talking about that she wasn't going to have a police chief employed under her that had filed bankruptcy." (Richie deposition at p. 49)  Richie further stated that he spoke with Whitley nightly on the phone prior to his appointment as police chief, and that "She spoke of Potter on every one of them, about his bankruptcy.  It just enraged her." (Richie deposition at pp. 17-19)    Richie described two meetings he had with Mayor Whitley at the Hartselle Dairy Queen and stated that both times she brought up the plaintiff's prior bankruptcy. (Richie deposition at pp. 12-17) She also asked him if he or a member of his family had ever filed bankruptcy. (Richie deposition at pp. 16-17)

18

The week prior to October 4, 2004, Mayor Whitley called Richie while he was in Morgan County and had him look up Potter's bankruptcy file at the Bankruptcy Court Clerk's Office, walking him through the process step-by-step. She instructed him to copy some documents that she had forgotten to copy and became angry when he refused. (Richie deposition at pp. 23-26)

It is for the trier of fact to determine the credibility of the witnesses and draw inferences from the facts they determine to be true. Considering the facts in the light most favorable to the nonmoving party, it is possible the trier of fact could find that Katie Whitley voted not to reappoint the plaintiff solely because of his bankruptcy.

The record shows a dispute over facts material to the ultimate legal conclusion of this question as to all defendants. Consequently, the court cannot grant summary judgment in their favor on the issue of Potter's claim under Section 525(a) claim, fact issues remaining to be resolved.

**II.**

### To state a claim under 42 U.S.C. § 1983, a plaintiff must show that a state actor has denied him or her a right created by the Constitution or laws of the United States.

Plaintiff Potter has alleged in his complaint that the City of Hanceville and members of its City Council discriminated against him solely because of his prior Chapter 7 filing when they appointed another person as Hanceville police chief. Potter seeks damages pursuant to 42 U.S.C. § 1983, a statutory cause of action that can provide a remedy at law or in equity for public actors' denial of rights created by the Constitution or laws of the United States.

Section 1983 originated in the Civil Rights Act of 1871 which was designed to enforce the rights of citizens under the U.S. Constitution, and certain other federal laws in the post-Civil-War

19

Reconstruction period. The modern statute itself is only one paragraph, and its language is relatively simple:

**Civil action for deprivation of rights**

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

The statute formerly appeared as 8 U.S.C. § 43. It was derived from the Act of April 20, 1871, codified at ch 22, § 1, 17 Stat. 13. Congress was attempting to override state laws deemed to deny equal protection of law under the new 14th Amendment and other constitutional/federal statutory guarantees; and to provide a remedy where state law was either facially inadequate, or inadequate as applied. In 1980, in <u>Maine v. Thiboutot</u>, 448 U.S. 1, the Supreme Court held that Section 1983 redress encompassed complaints based solely on rights created by federal statutes, and that the Civil Rights Attorney's Fees Awards Act of 1976 (42 U.S.C. § 1988) authorized an award of attorney's fees in appropriate cases.

Over the years, the Supreme Court has further refined analysis for determining whether the plaintiff may litigate a Section 1983 claim for denial of a federal statutory right. Justice Stevens, writing for the majority in <u>Golden State Transit Corp. v. City of Los Angeles</u>, 493 U.S. 103, 106-07 (1989), outlined a two-step inquiry:

... First, the plaintiff must assert the violation of a federal right. See <u>Middlesex County Sewerage Authority v. National Sea Clammers Assn.</u>, 453 U.S. 1 ... (1981). Section 1983

Case 05-70053-CMS    Doc 139    Filed 11/06/06    Entered 11/06/06 16:30:37    Desc Main
Document    Page 20 of 32

speaks in terms of "rights, privileges, or immunities", not violations of federal law. In deciding whether a federal right has been violated, we have considered whether the provision in question creates obligations binding on the governmental unit or rather "does no more than express a congressional preference for certain kinds of treatment." Pennhurst State School and Hospital v. Halderman, 451 U.S. 1, ... (1981). We have also asked whether the provision in question was "intend[ed] to benefit" the putative plaintiff. Id., at 43 ... .

Second, even when the plaintiff has asserted a federal right, the defendant may show that Congress "specifically foreclosed a remedy under § 1983," Smith v. Robinson, 468 U.S. 992, 1005, n. 9, ... (1984), by providing a "comprehensive enforcement mechanis[m] for protection of a federal right," id. at 1003, ... ; see also Middlesex County Sewerage Authority v. National Sea Clammers Assn., 453 U.S. 1, ... (1981); Preiser v. Rodriquez, 411 U.S. 475, ... (1973). The availability of administrative mechanisms to protect the plaintiff's interests is not necessarily sufficient to demonstrate that Congress intended to foreclose a § 1983 remedy. ... The burden to demonstrate that Congress has expressly withdrawn the remedy is on the defendant. ...

See also Wilder v. Virginia Hospital Association, 496 U.S. 498 (1990).

Justice Scalia, writing for the majority in City of Rancho Palos Verdes v. Abrams, 544 U.S. 113, 119 (2005) also pointed out, "Our subsequent cases have made clear, however, that § 1983 does not provide an avenue for relief every time a state actor violates a federal law." The court indicated that further analysis was needed to determine if the law in question actually created a "right":

... Accordingly, to sustain a § 1983 action, the plaintiff must demonstrate that the federal statute creates an individually enforceable right in the class of beneficiaries to which he belongs. ...

Even after this showing, "there is only a rebuttable presumption that the right is enforceable under § 1983." Blessing v. Freestone, 520 U.S. 329 ... (1997). The defendant may defeat this presumption by demonstrating that Congress did not intend that remedy for a newly created right. See ibid.; Smith v. Robinson, 468 U.S. 992. ... (1984). Our cases have explained that evidence of such congressional intent may be found directly in the statute creating the right, or inferred from the statute's creation of a "comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." Blessing, supra, at 341, ... . "The crucial consideration is what Congress intended." Smith, supra, at 1012 ... .

... The provision of an express, private means of redress in the statute itself is ordinarily an indication that Congress did not intend to leave open a more expansive remedy under § 1983. ...

21

See Abrams, 544 U.S. at 120-21.

In Abrams, the court held that the injunctive relief provided an amateur radio operator against a city zoning authority under 47 U.S.C. § 332(c)(7) of the Telecommunications Act of 1996 (TCA) was such "an express private means of redress," and the operator's sole remedy. Therefore, the operator could not pursue money damages for the violation under Section 1983.

Even earlier, the court in Smith v. Robinson, 468 U.S. 992, 1005, n.9 (1984) had stated that "Even if a plaintiff demonstrates that a federal statute creates an individual right, there is only a rebuttable presumption that the right is enforceable under § 1983." The Supreme Court has also noted that the Federal Water Pollution Control Act and the Education of the Handicapped Act contained the type of comprehensive administrative remedies required to displace Section 1983 claims. See Blessing v. Freestone, 520 U.S. 329, 347 (1997).

It appears to this court that Section 525(a) does create a "right" in a debtor or former debtor, a right not to be discriminated against by public actors in employment and other economic transactions "solely because" of the bankruptcy. The plain language and legislative history of Section 525(a), and its subsequent interpretive jurisprudence lead inevitably to that conclusion.

Further, there is no specific remedy or procedural requirements for enforcement set out in Section 525 itself that foreclose use of the Section 1983 remedy. (In contrast, Section 362(k) of the Bankruptcy Code creates a specific remedy for certain violations of the automatic stay, including the possibility of compensatory damages, punitive damages, and/or the award of attorney's fees. The 362(k) (formerly 362(h)) remedies show Congress' intent to create a private cause of action and state the elements needed to prove the cause of action.)

U.S. District Judge Guin in Taylor v. U.S. (In re Taylor), 263 B.R. 139 (N.D. Ala. 2001)

pointed out that there is no remedy included in Section 525(c)(1) specifically; and that Section 105(a)

has not traditionally been interpreted to create any private cause of action either. On appeal, the

District Court decision was reversing a bankruptcy court's award of damages under Section 105(a)

for a violation of Section 525(c)(1). The District Court stated:

> The bankruptcy court relied on § 105(a) of the Bankruptcy Code as authority to award plaintiff damages, citing In re Hopkins, 66 B.R. 828, 833-34 (Bankr. W.D. Ark. 1986) and In re Exquisito Services, Inc., 823 F.2d 151, 155 (5th Cir. 1987) ("[C]ourt has broad power to ensure debtor is not unduly denied benefits which inure to him under the Bankruptcy Code") as additional authority. Neither court, however, addressed the issue of whether a private right of action exists under § 525(a). There is no justification for relying on Exquisito Services to award damages in the case at bar. Exquisito Services awarded no damages. It simply required the Air Force to exercise its option with plaintiff.
>
> It is error for the court to rely on § 105(a) to confer a private right of action to collect damages. Bessette, 240 B.R. at 156, (Section 105 is not to be used for the purpose of crating(sic) private remedies that are not expressly or impliedly created in other provisions of title 11.) See Walls v. Wells Fargo Bank, N.A. 255 B.R. 38, at 45 (E.D. Cal. 2000) ("As the Supreme Court has repeatedly emphasized, the 'fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person.'").

Taylor, 263 B.R. at 151-52.

That suit had alleged only the Section 525 violation, and made no additional claim under Section

1983.

This strict construction of Section 105(a), and of the equitable powers of the bankruptcy court

generally, is a longstanding interpretation applied by the majority of courts. Section 105(a) does

empower the court in very non-specific terms to enforce its own orders, most normally using civil

contempt sanctions as coercive remedies for offenses against the court itself.

Consequently, this Bankruptcy Court cannot interpret the very general language of Section

105(a) as the sort of "comprehensive enforcement scheme" that, under Supreme Court precedent,

would bar access to a Section 1983 claim.

Further, courts in other fora have allowed violations of rights created by the Bankruptcy Code to be considered in Section 1983 litigation. See Higgins v. Philadelphia Gas Works, 54 B.R. 928, 934 (E.D. Pa. 1985); Gibbs v. Housing Authority of the City of New Haven, 76 B.R. 257, 261 (D. Conn. 1983); McKibben v. Titus County Appraisal District (In re McKibben), 233 B.R. 378, 385 (Bankr. E.D. Tex. 1999); and Maya v. Philadelphia Gas Works (In re Maya), 8 B.R. 202, 205 (Bankr. E.D. Pa. 1981). However, there is also some other non-precedential authority to the contrary. See Lesniewski v. Kamin (In re Lesniewski), 246 B.R. 202, 217 (Bankr. E.D. Pa. 2000); Coats v. Vawter (In re Coats), 168 B.R. 159, 167 (Bankr. S.D. Tex. 1993); and Begley v. Philadelphia Electric Company (In re Begley), 41 B.R. 402, 408 (E.D. Pa. 1984), aff'd. by 760 F.2d 46 (3rd Cir. 1985). The Eleventh Circuit Court of Appeals does not appear to have ruled on this particular issue.

Given the legal requirements of both Section 525(a) and Section 1983, the court cannot find that Potter is barred from bringing a Section 1983 claim based on a 525(a) violation. Consequently, the court must deny the defendants' summary judgment on their Section 1983 contention as well. Disputed facts require trial on Potter's Section 525(a) claim to determine if there is a violation, and there is no legal reason a violation, if proven, cannot be a predicate for Section 1983 damages.


### III.

### At this stage, "qualified immunity" cannot be applied to shield the defendants from litigation of this Section 1983 suit.

The court has already found that summary judgment cannot be granted to the defendants on their Section 525(a) claim, and that they cannot be granted summary judgment on their second claim

since proof of the violation could trigger Section 1983 damages.

In their third claim for summary judgment, defendants contended that, even if the action violated Section 525(a) and triggered the Section 1983 remedy, they are protected from suit as individuals by the doctrine of "qualified immunity." The court must also deny summary judgment on this ground as well.

A review of case law in this area suggests that the availability of qualified immunity to the defendant council persons turns on the issue of whether they were on notice that terminating Potter because of his bankruptcy violated federally created rights. If the fact-finder does determine that a majority of the council ended Potter's appointment "solely because" of his bankruptcy, "qualified immunity" cannot apply if the members had constructive or actual notice that such conduct violated a federal right.

The determining factor is whether the conduct complained of is a violation of a right "clearly established" by either the Constitution, a federal statute, and/or court interpretations of either in similar cases. If the illegality is clearly established by any of these three means, ignorance of the law will not immunize the council persons from suit under Section 1983. The standard is an objective one, not a subjective one.

In one of the seminal cases on the issue, Harlow v. Fitzgerald, 457 U.S. 800 (1982), the Supreme Court majority distinguished between the "absolute immunity," which protects certain public officials from all litigation; and the more limited "qualified immunity" which can shield officials from suit as individuals for participation in an unconstitutional or illegal "public" action. (The Hanceville defendants have not claimed to be protected by absolute immunity, only qualified immunity.) As stated in the Watergate-era Harlow, 457 U.S. at 807:

Our decisions have recognized immunity defenses of two kinds. For officials whose special functions or constitutional status requires complete protection from suit, we have recognized the defense of "absolute immunity." The absolute immunity of legislators in their legislative functions, see e.g. Eastland v. United States Servicemen's Fund, 421 U.S. 491, ... (1975), and of judges in their judicial functions, see e.g. Stump v. Sparkman, 435 U.S. 349. ... (1978), is now well settled. Our decisions also have extended absolute immunity to certain officials of the Executive Branch. These include prosecutors and similar officials, ... executive officers engaged in adjudicative functions, ... and the President of the United States, see Nixon v. Fitzgerald, 457 U.S. 731, ... .

For executive officials in general, however, our cases make plain that qualified immunity represents the norm. ...

As Justice Scalia, writing for the majority, pointed out in the later Anderson v. Creighton, 483 U.S. 635, 638-39 (1987), public officials performing discretionary functions may be immune "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated. ... (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law") ... ." The protection, the court stated, "turns on the 'objective legal reasonableness' of the action."

Generally, if conduct is plainly a violation of such a "clearly established" right, ignorance of the law will not immunize officials from suit for Section 1983 claims. See also Holloman v. Harland, 370 F.3d 1252, 1269 (11th Cir. 2004); and I.A. Durbin, Inc. v. Jefferson National Bank, 793 F.2d 1541, 1550 (11th Cir. 1986).

In some later opinions, the Supreme Court drew a line between the question of whether "qualified immunity" applied to the defendant, and the subsequent question of whether the action complained of actually violated rights created by the Constitution or federal statute. The Court refined the concept as an entitlement not to stand trial at all; not a mere defense to personal liability at trial. See Saucier v. Katz, 533 U.S. 194 (2001); and Hope v. Pelzer, 536 U.S. 730 (2002).

26

Justice Kennedy, writing for the majority in <u>Saucier</u>, urged that the "qualified immunity question" be resolved early in a case, stating that the constitutionality/legality of the public action does not alone determine the individual's immunity. In <u>Saucier</u>, a military police officer asserted qualified immunity in a suit charging him with using excessive force against an animal rights activist who had advanced on Vice President Gore at a rally. The MP argued that he had not thought that the action he took was unlawful in the circumstances. The Ninth Circuit Court of Appeals denied him summary judgment as to qualified immunity because material issues of fact remained to be tried on the constitutional violation itself.

On appeal, the Supreme Court reversed the Ninth Circuit's denial of the MP's motion for summary judgment, finding that the officer could not be sued for his actions because no law put him on specific notice that his conduct might be unlawful:

> The matter we address is whether the requisite analysis to determine qualified immunity is so intertwined with the question whether the officer used excessive force in making the arrest that qualified immunity and constitutional violation issues should be treated as one question, to be decided by the trier of fact. The Court of Appeals held the inquiries do merge into a single question. We now reverse and hold that the ruling on qualified immunity requires an analysis not susceptible of fusion with the question whether unreasonable force was used in making the arrest.

<u>Saucier</u>, 533 U.S. at 197.

At times, a trial court must address the possibility of a constitutional/statutory violation. The Supreme Court also stated in <u>Saucier</u>, 533 U.S. at 201:

> A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry. ... In the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established. This is the process for the law's elaboration from case to case, and it is one reason for our insisting upon turning to the

27

existence or nonexistence of a constitutional right as the first inquiry. The law might be deprived of this explanation were a court simply to skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case.

If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. <u>On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition</u>; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable. (emphasis added)

Justice Stevens wrote for the majority in <u>Hope v. Pelzer</u>, 536 U.S. 730 (2002), a Section 1983 suit against three Alabama prison guards, holding that their participation in the state's use of a hitching post to discipline prisoners was a violation of the Eighth Amendment. The Eleventh Circuit Court of Appeals had also found that use of the hitching post was constitutionally impermissible "cruel and unusual punishment;" but that, nevertheless, under circuit precedent, the guards were still entitled to qualified immunity from Section 1983 suit. The Supreme Court reversed the Eleventh Circuit on the immunity issue, stating:

... [T]he Eighth Amendment violation here is obvious. Any safety concerns had long since abated by the time petitioner was handcuffed to the hitching post because Hope had already been subdued, handcuffed, placed in leg irons, and transported back to prison. ... Despite the clear lack of emergency situation, respondents knowingly subjected him to a substantial risk of physical harm, to unnecessary pain caused by the handcuffs and the restricted position of confinement for a 7-hour period, to unnecessary exposure to the heat of the sun, prolonged thirst and taunting, and to a deprivation of bathroom breaks that created a risk of particular discomfort and humiliation. ...

Despite their participation in this constitutionally impermissible conduct, respondents may nevertheless be shielded from liability for civil damages if their actions did not violate "<u>clearly established statutory or constitutional rights of which a reasonable person would have known</u>." <u>Harlow v. Fitzgerald</u>. 457 U.S. 800, 818, ... (1982) ... [T]he Court of Appeals required that the facts of previous cases be " 'materially similar' to Hope's situation." 240 F.3d, at 981. This rigid gloss on the qualified immunity standard, though supported by Circuit precedent, is not consistent with our cases. (emphasis added)

28

Hope, 536 U.S. at 738-739.

Generally, defendants asserting qualified immunity at the summary judgment stage must make an initial showing that they are public officials performing discretionary acts in the course of their duties and within the scope of their authority. If a court, viewing evidence in the light most favorable to the plaintiff, determines that defendants did perform the challenged action as part of discretionary official duties within their authority, the burden then shifts to the plaintiff to overcome the defense of qualified immunity. See Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004).

In the Potter case, the undisputed record shows that members of the Hanceville City Council were public officials who took a discretionary action within the scope of their authority. That authority, by virtue of Ala. Code § 11-43-4, includes the power to make administrative decisions about personnel such as appointing Potter's successor. Further, there is no doubt that a voting majority of the council, under both law and custom, was the final decision maker on this and other issues of municipal administration.

Consequently, the burden shifted to Potter to come forward with evidence to show council members were not entitled to "qualified immunity." A plaintiff can overcome qualified immunity by a showing that (1) the defendant violated a statutory or constitutional right, and (2) this right was clearly established at the time of the alleged violation." See Harlow v. Fitzgerald, 457 U.S. 800 (1982); Holloman, 370 F.3d 1264; Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004); and Smith v. Siegelman, 322 F.3d 1290, 1295 (11th Cir. 2003).

Interpreting all of the evidence in the light most favorable to Potter, the court has already concluded that it is conceivable that the trier of fact could find that the council's action did violate a federal right created by Section 525(a). Consequently, the record so far does not foreclose the

Case 05-70053-CMS   Doc 139   Filed 11/06/06   Entered 11/06/06 16:30:37   Desc Main
Document   Page 29 of 32

possibility that Potter can prove the first part of the two-step test to overcome qualified immunity.

The second element is the notice factor. While there may have been a violation of a constitutional or statutory right of the plaintiff, the defendants would still be entitled to summary judgment as to qualified immunity if this right were not clearly established. Again, the burden is on the plaintiff to show that the right was clearly established. A right can be clearly established in one of three ways: (1) the words of the statute or constitutional provision can be specific enough to clearly establish the applicable law, (2) some broad statements of principle in case law can be sufficient, and (3) there can be a case with indistinguishable material facts. Williams v. Consolidated City of Jacksonville, 341 F.3d 1261, 1270 (11th Cir. 2003), cert. denied 543 U.S. 1187 (2005). See also Vinyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir. 2002).

11 U.S.C. § 525(a) was on the books and interpreted by case law long before the council member defendants took office in 2004. Section 525(a) provides specifically that a governmental unit may not "deny employment to, terminate the employment of, or discriminate with respect to employment against a person that is or has been a debtor under this title...". This city council on October 4, 2004 voted to appoint another person as chief of police in the city of Hanceville. This action ended Potter's employment with the city. AP Doc. 137 is Potter's evidence submitted in opposition to defendants' motion for summary judgment. The document includes copies of each individual defendant's response to the plaintiff's request for admissions. Each individual defendant admitted to Question 5 which stated "Defendant knew that it was a violation of law to terminate the employee's employment solely because that person participated as a debtor under chapter 7 of Bankruptcy Act."

The defendants characterize Potter's position as a political appointment which ended when

30

the new council took office, but the only submission in support of the motions for summary judgment related to his term of office is Title 11-43-4 which provides that he shall serve until his "successor or successors are elected and qualified".

The court has not been able to locate a case substantially similar to this dispute between Potter and Hanceville. The court does find that the language of Section 525(a) clearly established Potter's right not to be terminated solely due to his having filed a bankruptcy petition. The defendants characterizing the council's vote as making a political appointment of a new police chief or as filling a vacancy does not change the fact that it ended Potter's employment with the city.

Considering the facts in the light most favorable to the non-moving party Potter, the court finds that the statutory right not to be discriminated against as a result of his bankruptcy was clearly established. Consequently, the defendants' motions for summary judgment declaring them to be immune from Section 1983 suit on the theory of "qualified immunity" must also be denied at this point in the case.

Further, as stated in <u>Johnson v. Breeden</u>, 280 F.3d 1308, 1318 (11th Cir. 2002), defendants who are unsuccessful with their qualified immunity defense <u>before</u> trial can reassert it at the end of the plaintiff's case in a Fed. R. Bankr. Rule 50(a) motion:

> It is important to recognize, however, that <u>a defendant is entitled to have any evidentiary disputes upon which the qualified immunity defense turns decided by the jury so that the court can apply the jury's factual determinations to the law and enter a post-trial decision on the defense</u>. When the case goes to trial, the jury itself decides the issues of historical fact that are determinative of the qualified immunity defense, but the jury does not apply the law relating to qualified immunity to those historical facts it finds; that is the court's duty. <u>Stone v. Peacock</u>, 968 F.2d 1163, 1166 (11th Cir. 1992) ... ("[O]nce the defense of qualified immunity has been denied pretrial due to disputed issues of material facts, the jury should determine the factual issues without any mention of qualified immunity.")

Case 05-70053-CMS    Doc 139    Filed 11/06/06    Entered 11/06/06 16:30:37    Desc Main
Document    Page 31 of 32

**CONCLUSION**

For the reasons discussed above, the summary judgment motions of defendants City of Hanceville (AP Doc. 65); and council members Wayne Armstrong, (AP Doc. 60); Selma Barnett, (AP Doc. 61 ); Larry Cornett, (AP Doc. 62); Hubert Jones, (AP Doc.63); and Mayor Katie Whitley, (AP Doc. 64) are due to be **DENIED** on all three claims. The objection to summary judgment filed by plaintiff Edward Lee Potter (AP Doc. 136) is due to be **SUSTAINED.**

**DONE and ORDERED** this November 6, 2006.

/s/ C. Michael Stilson<br>
C. Michael Stilson<br>
United States Bankruptcy Judge